Joseph Patrick RYNCARZ, Plaintiff,

v.

Kenneth O. EIKENBERRY, Kathleen Mix, Chase Riveland, James Spalding, Ruben Cedeno, James Blodgett, Jerry Davis, Wayne Helgeson, Captain Morgan, CPM Grandmontagne, J. Van Skike, Lt. Dodd, Lt. Tim Gleason, Lt. Edwards, Rick Alt, D. May, Sgt. Bingham, C/O Roop, C/O Ritchie, C/O Piver, C/O Mitchell, C/O Hansen, Ron Lindquist, Dr. Kuzma, RN Wagner, PA Bailey, Diane Robertson, Don McLaren, Defendants.

No. CY–92–3061–JBH.

United States District Court,
E.D. Washington,
at Yakima.

June 25, 1993.

---

Joseph Patrick Ryncarz, pro se.

John Scott Blonien, Asst. Atty. Gen., Olympia, WA, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, IN PART, INTER ALIA

HOVIS, United States Magistrate Judge.

BEFORE THE COURT is the plaintiff's motion for partial summary judgment (Ct. Rec. 30) and the defendants' motion to dismiss (Ct.Rec. 34).

### FACTUAL BACKGROUND

This is a 42 U.S.C. § 1983 action. Plaintiff alleges that various of his constitutional rights were violated when the defendants required him to submit to a blood draw pursuant to the State of Washington's DNA identification program. RCW 43.43.754 states:

> After July 1, 1990, every individual convicted in a Washington superior court of a felony defined as a sex offense under RCW 9.94A.030(29)(a) or a violent offense as defined in RCW 9A.94.030(32) shall have a blood sample drawn for purposes of DNA identification analysis. For persons convicted of such offenses after July 1, 1990, who are serving a term of confinement in a county jail or detention facility, the county shall be responsible for obtaining blood samples prior to release from the county jail or detention facility. For persons convicted of such offenses after July 1, 1990, who are serving a term of confinement in a department of corrections facility, the department shall be responsible for obtaining

blood samples prior to release from such facility. Any blood sample taken pursuant to RCW 43.43.752 through 43.43.758 shall be used solely for the purpose of providing DNA or other blood grouping tests for identification analysis and prosecution of a sex offense or a violent offense.

From the admissions contained in defendants' answer and jury demand (Ct.Rec. 20), the court has ascertained the following uncontroverted facts.

On or about March of 1992, plaintiff was in the custody of the Washington State Department of Corrections at the Washington State Penitentiary (WSP). Plaintiff was asked to submit a blood sample for purposes of DNA identification analysis. Plaintiff refused to submit to a blood draw, alleging that to do so would be contrary to his religious beliefs. Plaintiff was given thirty days in which to initiate a legal challenge to the proposed blood draw.

In a petition dated March 26, 1992 and submitted to the Secretary of Department of Corrections, Chase Riveland, and to the Director of the Department of Prisons, James Spalding, plaintiff challenged the validity of Department of Corrections Policy No. 620.-002 pertaining to non-consensual blood draws.

On April 7, 1992, the Washington State Court of Appeals, Division III, reversed plaintiff's convictions for 1) second degree assault, RCW 9A.36.021(1)(c) [1]; 2) possession of a pistol by a felon, RCW 9.41.040(1); 3) possession of a .12 gauge loaded shotgun in a vehicle, RCW 77.16.250; and 4) extortion, RCW 9A.56.110 and .120(1).[2]

In a letter addressed to plaintiff and dated April 13, 1992, defendant Spalding acknowledged receipt of plaintiff's petition. Spalding stated that he had asked the state attorney general's office to review the issue. However, he also informed plaintiff that "at this time," the Department of Corrections had statutory authority to use force to obtain identification information and plaintiff should adhere to WSP field instructions.

On April 17, 1992, plaintiff was being held at the Medium Security Complex (MSC), Blue Mountain Unit (BMU). On that date at approximately 8:15 a.m., Correctional Officer James Roop approached plaintiff's cell and ordered the plaintiff to report to the "Lieutenant's office." Roop did not inform plaintiff why he was being ordered to report to the Lieutenant. Roop and Correctional Officer William Ritchie escorted the plaintiff to Major Control. Officer Roop conveyed to plaintiff that it was his impression that plaintiff was being ordered to report for a work detail.

Plaintiff was eventually directed to a strip search room where he was met by defendants Dodd, Gleason, Bingham, Piver, Mitchell, and Hansen (all of whom are WSP correctional staff). Defendants placed restraints on the plaintiff's ankles and wrists and secured a waist chain around his waist. Defendant Hansen recorded the events with a hand-held video recording device. Defendant Piver conducted a pat-down search of plaintiff and removed a key ring from plaintiff's pocket and also removed plaintiff's coat, hat, gloves and belt. The defendants did not inform plaintiff why this was being done.

Defendants Dodd, Piver, and Mitchell directed plaintiff out of the strip search room and proceeded through the administrative offices of the building. With the plaintiff under full restraint, defendants Dodd, Piver, Mitchell and Hansen escorted plaintiff from MSC and proceeded by van to the main institution of WSP.

Plaintiff was taken to the trauma room within the hospital building. Defendant Hansen continued to record the events. Defendants Bailey and Robertson (WSP medical personnel) then appeared in the trauma room. Plaintiff's blood was drawn. Plaintiff was provided medical attention on or about April 18, 1992.

---

**1.** This is considered a "violent offense" under RCW 9.94A.030(33). Note that RCW 9.94A.030(32) was renumbered as 9.94A.030(33). See Reviser's Note to RCW 43.43.754.

**2.** This is also considered a "violent offense." See footnote 1 *supra*.

Plaintiff's blood specimen was sent to defendant McLaren at the DNA laboratory in Seattle, Washington where it will be utilized in a computerized data bank. The Washington State Patrol originally informed plaintiff that they did not have records indicating that they had received plaintiff's blood for DNA testing analysis.

## PROCEDURAL BACKGROUND

In an order dated October 30, 1992 (Ct. Rec. 7), the Honorable Alan A. McDonald adopted the report and recommendation of the undersigned (Ct.Rec. 5). Accordingly, the following claims in plaintiff's first amended complaint were dismissed: 1) claim for money damages against defendants in their official capacities; 2) claim that equal protection rights were violated; 3) claim that right to privacy was violated. The undersigned ordered service of plaintiff's first amended complaint insofar as plaintiff's claims that he was subject to an unreasonable search, denial of due process rights, denial of religious freedom, and deliberate indifference to his serious medical needs.

In his order, Judge McDonald stated that plaintiff's allegation of a Fourth Amendment violation had no basis in either law or fact. Citing *Jones v. Murray*, 962 F.2d 302, 306–07 (4th Cir.1992), Judge McDonald found that the mere drawing of blood is a minor intrusion which does not shock the conscience and the slight intrusion is outweighed by the government interest in the intrusion.

█ Defendants seem to allege that there is some inconsistency between Judge McDonald's order and the order granting in forma pauperis status filed by the undersigned on June 19, 1992 (Ct.Rec. 3). That is not true. The undersigned stated that there was a Fourth Amendment claim only to the extent that plaintiff claimed that the use of force in obtaining the blood draw was excessive. As defendants correctly note, however, excessive force claims asserted by prisoners are analyzed under the Eighth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 n. 10,

109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989).

The claims that remain for disposition include: 1) unreasonable search under the Fourth Amendment; 2) excessive force under the Eighth Amendment; 3) deliberate indifference to serious medical needs under the Eighth Amendment; 3) denial of procedural due process rights under the Fourteenth Amendment [3]; 4) and denial of religious freedom under the First Amendment.

## DISCUSSION

### A. Plaintiff's Partial Summary Judgment Motion

Plaintiff claims that he should be granted partial summary judgment to the extent that his complaint seeks injunctive and declaratory relief. The basis for plaintiff's request is that counsel for defendants, during the course of settlement negotiations, purportedly offered to stipulate to an award of injunctive relief in exchange for dismissal of plaintiff's complaint.

Pursuant to Federal Rules of Evidence 408:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Plaintiff's motion is premised on evidence which the court cannot consider. Accordingly, plaintiff's motion for partial summary judgment is **DENIED**.

### B. Qualified Immunity

█ "[G]overnment officials performing discretionary functions[ ] generally are shielded from liability for civil damages [in a

---

**3.** Contrary to defendants' assertion, Judge McDonald did not dismiss plaintiff's due process claims. As noted in the order granting in forma pauperis status (Ct.Rec. 2), plaintiff's due process

challenge is premised on his assertion that his challenge to the WSP Field Instruction was not completed prior to the blood draw.

section 1983 action] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This "clearly established law" test requires more than an alleged "violation of extremely abstract rights." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640–641, 107 S.Ct. at 3039. In other words, "in the light of preexisting law the unlawfulness must be apparent." *Id.* See: *Lum v. Jensen, et al.,* 876 F.2d 1385 (9th Cir.1989) *cert. den.* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990); *The Presbyterian Church (USA) v. United States,* 870 F.2d 518, 527 (9th Cir.1989); *Tribble v. Gardner et al.,* 860 F.2d 321 (9th Cir.1988) *cert. den.* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

■ To determine whether this standard is satisfied, the Ninth Circuit Court of Appeals recently established a two-part analysis: 1) Was the law governing the official's conduct clearly established?; 2) Under that law, could a reasonable officer have believed that the conduct was lawful? [4] *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir. 1993). *See also Hemphill v. Kincheloe,* 987 F.2d 589, 591–92 (9th Cir.1993).

Defendants argue that the rights claimed by plaintiff are not clearly established. In the alternative, defendants argue that even if those rights are clearly established, a reasonable officer would not have known that he was violating those rights.

1. Fourth Amendment—Unreasonable Search

*Jones v. Murray,* 962 F.2d 302 (4th Cir. 1992), involved a Virginia statute which, like the Washington statute cited above, required convicted felons to submit blood samples for DNA analysis. The statute was challenged on the ground that it violated the Fourth Amendment prohibition against unreasonable

searches and seizures by authorizing searches in the absence of any individualized suspicion.

The *Jones* court noted that it was not aware of any case establishing a per se Fourth Amendment requirement of probable cause, or even a lesser degree of individualized suspicion, when government officials conduct limited searches for the purpose of ascertaining and recording the identity of a person who is lawfully confined to prison. According to the court, "this is not surprising when we consider that probable cause had already supplied the basis for bringing the person within the criminal justice system." *Id.* at 306.

■ Persons who are lawfully arrested and convicted felons lose a right of privacy from routine searches of the cavities of their bodies and their jail cells. *Id.* (citing *Bell v. Wolfish,* 441 U.S. 520, 559–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979) and *Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984)). When a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. The identification of suspects is relevant to solving the crime for which the suspect is arrested and also for maintaining a permanent record to solve other past and future crimes. *Id.*

The *Jones* court noted that every suspect arrested for a felony is subject to fingerprinting. Although this type of intrusion would not be acceptable for free persons without Fourth Amendment protection, the same protection is not applicable to those lawfully confined to the custody of the state. Accordingly, the court found that the Fourth Amendment does not require an additional finding of individualized suspicion before blood can be taken from incarcerated felons for the purpose of identifying them. *Id.* at 306–07.

The *Jones* court went on to evaluate the "reasonableness" of the searches involved in the taking of blood samples. According to

4. This latter inquiry, although ultimately a legal question, may require some factual determina-

tions. *Romero v. Kitsap County,* 931 F.2d 624, 628 (9th Cir.1991).

the court, "[I]n the absence of a requirement for individualized suspicion, assuming that the Fourth Amendment continues to apply to lawfully confined prisoners, we must nevertheless determine the reasonableness of any search." Based on previous judicial decision[5], the court found the blood testing can be reasonable under the Fourth Amendment, even with respect to free individuals, where the slight intrusion is outweighed by the governmental interest advanced by the intrusion. *Id.* at 307.

■ The undersigned finds the *Jones* analysis persuasive. The Washington statute, like the Virginia statute, is facially valid. Accordingly, to the extent plaintiff claims that the statute is invalid on Fourth Amendment grounds, his complaint must be dismissed. However, plaintiff's challenge goes beyond the facial validity of the statute. He argues that he was not subject to the statute's mandate at the time his blood was drawn because he was no longer a felon within the scope of the statute.

In his first amended complaint, plaintiff alleges that on April 17, 1992, before his blood was drawn, plaintiff gave defendants Dodd, Piver, Mitchell and Hansen a "full and accurate oral report as to the status of the reversal of his convictions and the holdings of the Court of Appeals, Division III." Defendants flatly deny this in their answer to the first amended complaint.

In assessing whether plaintiff had a "clearly established right" under the Fourth Amendment to not be subject to the blood draw, the first question is whether the state had a legitimate penological interest to draw blood from the plaintiff even after his convictions had been reversed. It is not clear whether these convictions were the only convictions for which the plaintiff was serving time. It is not clear therefore whether plaintiff was subject to immediate release after reversal of those convictions or whether he remained a "convicted felon," although not a felon to whom the statute is applicable.

■ If plaintiff was effectively a "free" person following reversal of the convictions, the protection of the Fourth Amendment would have been fully applicable. Accordingly, drawing blood from the plaintiff without individualized suspicion would simply have not have been constitutionally acceptable. As a "free person," plaintiff's right to Fourth Amendment protection would be clearly established. *See Jones* at 306.

If plaintiff was still a convicted felon even following the reversal of the particular convictions, it would still be incumbent upon the state to show that there was some legitimate penological interest for conducting the blood draw. *See Walker v. Sumner,* 917 F.2d 382 (9th Cir.1990). In *Walker,* the plaintiff claimed that the involuntary withdrawal of his blood following the threatened use of "taser" guns constituted an unreasonable search and seizure. The court noted that prisoners do not forfeit all constitutional rights, although those rights, are subject to substantial limitations and restrictions in order to achieve legitimate correctional goals and maintain institutional security. Prison officials must put forward a legitimate governmental interest to justify their regulation and must provide evidence that the proffered interest is the reason why the regulation was adopted or enforced. *Id.* at 385 (citations omitted).

In *Walker,* although prison officials stated that the purpose of the blood draw was for HIV testing, the court found they had not introduced any evidence that the testing was for a legitimate penological objective. In the absence of any relevant evidence (affidavits, deposition testimony, etc.), the court could not determine whether the defendants' asserted justification (protecting the health, safety and welfare of the prison population) was the actual reason for the mandatory testing. Furthermore, the court could not determine if the policy of mandatory testing was reasonably related to the objective and what prison officials planned to do with infor-

---

5. *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (Supreme Court upheld program requiring mandatory blood testing of an entire class of railway employees for safety reasons, i.e. detection of drug and/or alcohol usage); *Dunn v. White,* 880 F.2d 1188 (court upheld mandatory blood testing of prisoners to detect presence of HIV among prisoners).

mation obtained. *Id.* at 386–87. According to the court:

> Without a further explanation, general protestations of concern for the welfare of the citizens of Nevada and the prison community are simply insufficient to render the involuntary seizure of blood specimens, even from prison inmates, constitutionally reasonable.

*Id.* at 387.

In the instant case, defendants have (as yet) not proffered a legitimate governmental interest for drawing blood from plaintiff following the reversal of his convictions. The statute covers only a certain class of violent and sexual felons and the court can only assume that plaintiff no longer fell within that class once the particular convictions were reversed.

In *Jones*, the court held that the Virginia statute was valid even insofar as it applied to non-violent felons. According to the court, despite the fact that it was more likely that a DNA sample would be found at the scene of a violent crime, there are uses for DNA technology other than merely verifying a suspect's presence at a crime scene (i.e. DNA print might be used to identify a criminal suspect who has attempted to alter or conceal his identity). 962 F.2d at 308.

A dissent by one of the Fourth Circuit judges in *Jones* argued that there was a clear distinction between violent and non-violent felons in terms of Fourth Amendment protection. The dissent stated that there exists no blanket authorization of searches involving intrusions of the skin for which no individual, whether in prison or out, loses a reasonable expectation of privacy. *Id.* at 311. It stated that the privacy interest of a prisoner remaining free from bodily invasion was to be balanced against the state interest in carrying out the search. *Id.* at 312 (citing *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). The dissent felt that the state's proffered reason for the testing of

non-violent felons ("administrative ease") did not "outweigh a prisoner's expectation of privacy in not having blood withdrawn from his body when that prisoner is not significantly more likely to commit a violent crime in the future than a member of the general population." *Id.* at 313–14.

■ The undersigned believes that the dissent's analysis with respect to inmate privacy interests in blood testing is consistent with the Ninth Circuit's decision in *Walker*. The *Walker* decision is legal precedent which clearly establishes that inmates have a right to not have their blood drawn absent evidence of a legitimate penological objective for that type of search.

As noted, the second inquiry in the two-part qualified immunity analysis is whether a reasonable officer could have believed the particular conduct at issue was lawful. This inquiry, although ultimately a legal question, may require some factual determinations. If defendants did not have actual knowledge of the reversal of plaintiff's convictions and legitimately believed that plaintiff was subject to testing because of the DNA identification statute (or for any other legitimate penological reason), they may well be entitled to qualified immunity. Indeed, there may not even be a Fourth Amendment violation. However, the existing record does not contain the evidence which the court needs to make such a determination (there has been no discovery, there are no affidavits, there is no deposition testimony).

Concerning plaintiff's Fourth Amendment claim, the court will not grant qualified immunity to defendants based on the existing record.[6]

## 2. Eighth Amendment—Cruel and Unusual Punishment

Plaintiff's Eighth Amendment claim appears to have two components: 1) excessive force; and 2) deliberate indifference to serious medical needs.

---

6. Plaintiff has also alleged a violation of his right to privacy under the Ninth Amendment. However, the Ninth Amendment has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim. *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir.1986). The court will consider plaintiff's "right to privacy" in the context of the Fourth Amendment's prohibition against unreasonable searches. *See Grummett v. Rushen*, 779 F.2d 491, 493 n. 1 (9th Cir.1985).

In *Hudson v. McMillian,* — U.S. —, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), the Supreme Court discussed the excessive force analysis applicable to claims made by prisoners. The Court held that whenever prison officials stand accused of using excessive physical force, the "core judicial inquiry" is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Id.* — U.S. at —, 112 S.Ct. at 999 (citing *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). When prison officials maliciously and sadistically cause harm, contemporary standards of decency are always violated, whether or not "significant injury" is evident. *Id.* — U.S. at —, 112 S.Ct. at 1000. *See also McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1992).

*Hudson* and *Whitley* were clearly established precedent at the time that events in the instant case took place. *See also McRorie v. Shimoda,* 795 F.2d 780 (9th Cir.1986). Accordingly, the crucial inquiry is whether a reasonable officer could have believed lawful the particular conduct at issue. It is undisputed that prior to the blood draw, plaintiff was placed in full physical restraints and transported to the trauma room. This was a non-consensual blood draw. Physical force was used to obtain the blood sample. DOC Policy 620.002 authorizes the use of such restraints "as may be necessary" for the purpose of permitting the blood to be drawn.

As with plaintiff's Fourth Amendment claim, the question of qualified immunity depends on plaintiff's status at the time of the blood draw and whether that status was communicated to defendants. Plaintiff says he informed the defendants (Dodd, Piver, Mitchell and Hansen) that his convictions had been reversed. Defendants claim they were not so informed. If prior to the blood draw, defendants knew or had a legitimate reason to suspect that plaintiff was no longer a "violent offender" for purposes of the DNA statute, their conduct in proceeding with the blood draw was not lawful. A reasonable officer, in light of existing precedent, would not consider such conduct lawful. Without further development of the record, it is not possible to rule as a matter of law that defendants acted in good faith in subjecting plaintiff to physical force.

Insofar as plaintiff's excessive force claim, a crucial factual determination is necessary before the court can determine whether it should grant qualified immunity.

To state a valid claim for denial of adequate medical care, a prisoner must show that the defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05, 97 S.Ct. at 291. However, not every failure to provide medical care constitutes a claim under the Eighth Amendment.

> "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."

*Id.* at 106, 97 S.Ct. at 292.

Plaintiff alleges that defendant Bailey did not take reasonable sanitary precautions in conducting the blood draw. Plaintiff says that an "unsheathed needle" was used and that his arm was not sanitized. According to plaintiff, the draw was conducted in such a manner as to cause the blood vessels to rupture and tear, forcing blood to flow into the "surrounding muscle fibers" of plaintiff's arm. Plaintiff states he was "unnecessarily exposed to deadly virus, bacteria and contamination; compromising [his] right to be free from [threat] of infection." Plaintiff alleges he was denied access to medical care until the following day, and that as a result of the delay, he has "internal scars, hemorrhaging (sic) and cannot enjoy the full freedom of strength and movement of his left arm."

**1502**

Based on the facts alleged, plaintiff's claim of deliberate indifference to his serious medical needs is only plausibly germane to defendants Bailey and Robertson.[7] These were the two medical personnel present during the blood draw. Even assuming that plaintiff's injuries are real, the facts alleged simply do not amount to an Eighth Amendment claim for deliberate indifference to serious medical needs. At the very most, plaintiff has stated a claim for negligence (medical malpractice). Negligence is not actionable under section 1983. *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

A reasonable officer, standing in the shoes of defendant Bailey or Robertson, would have believed his conduct lawful under the Eighth Amendment. Accordingly, defendants Bailey and Robertson are entitled to qualified immunity from damages. Furthermore, because the plaintiff has not stated facts sufficient to support his claim, there are no grounds for awarding equitable relief.

### 3. First Amendment—Free Exercise Clause

Plaintiff alleges that certain of the named defendants knew or should have known of plaintiff's challenge to the nonconsensual blood draw policy on religious grounds. Plaintiff claims the blood draw was conducted "maliciously, wantonly, knowingly and recklessly" for the purpose of depriving him of his right to exercise his religious beliefs. According to plaintiff, his religious beliefs prohibit him from shedding his blood. Plaintiff equates the blood draw to a "demonic blood ritual" for the purpose of depriving him of part of his soul.

 Under the Free Exercise Clause of the First Amendment, a law that burdens religious practice need not be justified by a compelling governmental interest if it is neutral and of general applicability. *Employment Div. Dept. of Human Services v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). However, where a law is not neutral or is not of general application it must undergo rigorous scrutiny. It must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest. *Church of the Lukumi Babalu Aye Inc. v. City of Hialeah,* —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). In determining whether a burden is justified where the law is not neutral or of general applicability, this court would follow the analysis in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) and *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). The factors the court would then consider in determining if the burden is justified, are: 1) whether the regulation has a logical connection with the legitimate governmental interests invoked to justify the regulation; 2) whether an alternative means exists for the inmate to exercise the constitutional right; 3) the impact which accommodation of the asserted right would have on other inmates, on prison personnel, and on allocation of prison resources; and 4) the absence of ready alternatives. *Shabazz,* 482 U.S. at 350–53, 107 S.Ct. at 2405–07.

This analysis is not necessary in this case. R.C.W. 43.43.754 is generally applied to those within its purview and there is absence of any evidence that would question its neutrality regarding the free exercise of religion. Both the statute and the accompanying DNA policy are neutral towards imposing a burden on religion. The *Jones* case clearly shows the strong interest the government has in maintaining a permanent record of a violent or sexual offender's DNA to assist in solving past and future crimes.

Furthermore, even if R.C.W. 43.43.754 were not neutral or of general application, plaintiff's allegations would not survive the *Shabazz* analysis. The blood test is a one-time procedure and does not involve an ongoing future restriction of plaintiff's ability to exercise his religion. Accommodating plaintiff's religious principles would effectively make the DNA statute meaningless. Other inmates convicted of "violent" and "sexual" offenses would also undoubtedly claim that their religious principles (even if they are not

---

7. Plaintiff states that defendant Edwards refused plaintiff's request to have a photograph taken of the "injury;" however, the court fails to see how that amounts to deliberate indifference towards the plaintiff's serious medical needs.

sincerely held) are violated by the blood draw. Plaintiff has not pointed to an alternative that fully accommodates his rights at de minimis cost to the valid penological interest advanced by the state of Washington.

The real issue in the instant case is not the free exercise of religion. The real issue, the court emphasizes once again, is not with the statute, but rather with whether the defendants were justified in proceeding with the blood draw after plaintiff allegedly told them that his convictions had been reversed. If the statute is not applicable to plaintiff, then it did not by its terms burden plaintiff's religious practices.

■ The material facts do not indicate that plaintiff directly told defendants Piver, Mitchell, Dodd and Hansen that he also considered the blood draw as contrary to his religious principles. Accordingly, a reasonable officer in their position would not have believed he was violating the plaintiff's First Amendment rights by proceeding with the blood draw. Accordingly, defendants are entitled to qualified immunity with respect to plaintiff's First Amendment claim.

C. Personal Participation

■ A complaint must set forth the specific facts upon which plaintiff relies in claiming the liability of each defendant. Fed. R.Civ.P. Rule 8(a)(2); *Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir.1982). Even a liberal interpretation of a civil rights complaint may not supply essential elements of a claim that the plaintiff failed to plead initially. *Id.* at 268. In order to establish liability pursuant to section 1983, plaintiff must set forth facts demonstrating how each defendant caused or personally participated in causing a deprivation of his protected rights. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir.1981).

"[A] person deprives another of a constitutional right, within the meaning of section 1983, 'if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains].'" *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir.1988)

*quoting Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978) (emphasis original).

■ Plaintiff cannot hold a defendant liable solely on the basis of his supervisory position because the Civil Rights Act does not permit liability under **respondeat superior**. *Padway v. Palches*, 665 F.2d 965, 968 (9th Cir.1982) (citing *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 691–95, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978)).

Plaintiff names Kenneth Eikenberry, former Washington State Attorney General, as a defendant. Plaintiff also names Kathleen Mix, an assistant attorney general, as a defendant. There is no evidence that either of those individuals authorized the blood draw from plaintiff.

■ Plaintiff names Chase Riveland, Secretary of the Department of Corrections, and James Spalding, Director of the Division of Prisons, as defendants. Plaintiff alleges in his complaint that he sent copies of his "petition" challenging the DNA statute and the DOC regulation to both Riveland and Spalding. Spalding responded to the petition advising that force could be used to take the blood sample. His advice is accurate and consistent with DOC Policy 620.002. That policy was implemented pursuant to Riveland's authority. As previously noted, the court considers the DNA statute and the DOC policy to be facially valid. There is no evidence that either Spalding or Riveland had anything to do with the authorization of the blood draw from plaintiff.

It is not clear from the record who specifically was responsible for authorizing the blood draw from plaintiff. According to DOC Policy 620.002, if the cooperation of the inmate cannot be obtained, the superintendent of the institution may authorize the use of restraints to secure the blood sample. Defendant Blodgett apparently was the superintendent of WSP at the time of plaintiff's blood draw. Although there is no allegation that Blodgett authorized the draw or that he had any knowledge of the reversal of plaintiff's convictions, the court believes it is inappropriate to dismiss him as a defendant at this time.

Plaintiff names, as a defendant, Ruben Cedeno, Director of Offender Programs for the Department of Corrections. Plaintiff also names as defendants Jerry Davis and Wayne Helgeson, assistant superintendents at WSP; Richard Morgan, captain at WSP; WSP Correctional Program Manager Grandmontagne; WSP Custody Unit Supervisor Van Skike; WSP Counselor Rick Alt; WSP Counselor D. May; and Correctional Officers Roop and Ritchie. There is no allegation or evidence that any of these defendants had anything to do with the authorization of the blood draw or otherwise personally participated in physically restraining the plaintiff during the blood draw.

Plaintiff names WSP Lt. Tim Gleason, WSP Lt. Edwards and WSP Sgt. Bingham as defendants. Plaintiff alleges that Gleason and Bingham were present at the strip search room at "BMU Major Control" on the day of the blood draw. He does not allege that they authorized the blood draw or that they were at all involved in escorting him to the trauma room and physically restraining him during the blood draw. Plaintiff alleges that Lt. Edwards refused his request that a photograph be taken of his arm following the blood draw. The court fails to see how this is a claim of constitutional magnitude. The court has already found that plaintiff has not stated facts sufficient for an Eighth Amendment medical care claim. Plaintiff does not allege that Edwards was either involved in the authorization of the blood draw or in physically restraining him during the blood draw.

In addition to defendants Bailey and Robertson, plaintiff names several other WSP medical personnel as defendants: Ron Lindquist, Hospital Administrator; Dr. Kuzma; and RN Wagner. There is no evidence or allegation that these individuals authorized or actually participated in the blood draw. In any event, the court has found that plaintiff's Eighth Amendment claim for deliberate indifference to medical needs is without merit. Accordingly, all of the medical personnel

named as defendants must be dismissed from this action.

Plaintiff names Don McLaren of the Washington State Patrol as a defendant. Plaintiff indicates that McLaren is the laboratory director for the "DNA Section" of the Washington State Patrol Crime Laboratory. Plaintiff contends that McLaren is the custodian of the blood sample taken from plaintiff on April 17, 1992 and that the court should order McLaren to return the blood specimen to plaintiff and expunge all references to plaintiff in any state file. Should the court find that plaintiff's blood draw was constitutionally improper or otherwise contrary to state law [8], the injunctive relief requested by plaintiff may be appropriate. Accordingly, the court believes that McLaren is a properly named defendant.

## CONCLUSION

**IT IS HEREBY ORDERED:**

1. Plaintiff's motion for partial summary judgment is **DENIED.**

2. Defendants' motion to dismiss is **GRANTED in part and DENIED in part.**

3. Plaintiff's Eighth Amendment claim for deliberate indifference to serious medical needs is **DISMISSED with prejudice.**

4. Defendants are entitled to qualified immunity from damages with respect to plaintiff's First Amendment claim. To that extent, plaintiff's First Amendment claim is **DISMISSED with prejudice.**

5. The following defendants are **DISMISSED from this action with prejudice: Kenneth O. Eikenberry; Kathleen Mix; Chase Riveland; James Spalding; Ruben Cedeno; Jerry Davis; Wayne Helgeson; Captain Morgan; CPM Grandmontagne; CUS Van Skike; Lt. Tim Gleason; Lt. Edwards; Rick Alt; D. May; Sgt. Bingham; CO Roop; CO Richie; Ron Lindquist; Dr. Kuzma; RN Wagner; PA Bailey; and Diane Robertson.**

---

8. Plaintiff alleges a host of state law claims based on the state constitution and statutory law. Judge McDonald found that some of the constitutional claims are without merit (Ct.Rec. 7). The balance of the state law claims will be addressed at a later time.

## REVISED SCHEDULING ORDER

This court previously entered an order (Ct. Rec. 39) vacating the discovery deadline. The court indicated it would establish a new discovery deadline upon resolution of the parties' motions. The previous scheduling order set a dispositive motion deadline for July 6, 1993. Obviously, the parties are not in a position to complete discovery prior to the existing dispositive motion deadline. Accordingly, the court's prior scheduling order (Ct.Rec. 24) is **VACATED** and the following schedule shall now apply:

1. DISCOVERY. All discovery shall be completed by **August 30, 1993.** THE PARTIES SHALL FILE NO FURTHER DISCOVERY EXCEPT THOSE PORTIONS NECESSARY TO SUPPORT MOTIONS.

2. DISPOSITIVE MOTIONS. Dispositive motions with supporting briefs and L.R. 56 statements shall be filed and served no later than **September 27, 1993.** Responses shall be filed and served no later than **October 18, 1993,** with replies, if any, to be filed and served no later than **November 1, 1993.** Unless telephonic oral argument is affirmatively requested through the motion caption or response, the motions shall be heard without oral argument at 1:30 P.M., **November 8, 1993.**

**PLAINTIFF IS FURTHER ADVISED** if the Defendants file a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56, *Plaintiff is required to respond to the factual assertions in the motion to avoid this court's conclusion the facts as reported by Defendants are uncontroverted.* Plaintiff should further develop the facts in his complaint with additional evidence from affidavits, depositions, answers to interrogatories and admissions that establish a genuine issue of fact for trial. Furthermore, pursuant to Local Rule 56, the specific facts relied upon by Plaintiff must be written in serial form and refer to the specific portion of the record where each fact is established. **Any uncontroverted fact is admitted to exist without controversy.** See Local Rule 7, Eastern District of Washington, for further procedural requirements. Regardless of whether a party is represented by an attorney, the party is responsible for understanding the requirements in the federal and local rules.

3. EXHIBIT LIST. Exhibit lists shall be filed and served and exhibits made available for inspection (or copies provided) on or before **September 27, 1993.** Objections to exhibits shall be filed and served on or before **October 11, 1993** and shall be heard at the pretrial conference. All exhibits shall be pre-marked: plaintiff's are to be numbered 1 through 99; defendants' are to be numbered 100–199.

4. DEPOSITIONS. Relevant, substantive deposition testimony (as distinguished from impeachment testimony) shall be highlighted by colored marker and served on the opposing party before **September 27, 1993.** Cross-designations of relevant deposition testimony shall be highlighted in a different color and served on the opposing party on or before **October 11, 1993.** Objections to any designated deposition testimony shall be filed and served on or before **October 25, 1993.** Those objections will be heard and resolved at the pretrial conference.

5. MOTIONS IN LIMINE. All unresolved substantive or evidentiary issues which may foreseeably arise during trial shall be addressed by motions in limine to be served and filed not later than **October 11, 1993.** Such motions will be addressed and resolved at the pretrial conference.

6. SETTLEMENT CONFERENCE. Before **November 22, 1993,** counsel for Defendants shall advise the court by letter if an agreed SETTLEMENT has been reached. If a settlement is not reached, Defendants' counsel shall propose a series of dates on which to hold a settlement conference in the chambers of the undersigned. If either party has an objection to the undersigned's involvement in settlement, the matter shall be referred to another magistrate judge.

7. The PRETRIAL CONFERENCE will be conducted telephonically on **November 22, 1993 at 9:00 a.m.** Proposed pretrial orders or an agreed pretrial order must be lodged three days prior to the pretrial conference in compliance with Local Rule 16. Defendants' counsel will initiate the conference call to Judge Hovis at (509) 454–5772.

8. TRIAL. Requested voir dire questions, proposed jury instructions and trial briefs shall be filed and served no later than **January 10, 1994.** Jury selection will commence **January 25, 1994** at 10:00 a.m. in Yakima. Trial will commence immediately thereafter.

The State of Washington shall transport plaintiff to the Yakima County Jail on or before **January 21, 1994,** be responsible for his security when he is in Yakima, have him available for jury selection on **January 25** as later advised; and shall return plaintiff to the Washington State Penitentiary at the close of trial.

**IT IS SO ORDERED.**